# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

**JULIE BEVERLY,**        )
    Plaintiff,        )
                      )
v.        )        Civil Action No. 2:09cv00050
                      )        **REPORT AND**
                      )        **RECOMMENDATION**
**MICHAEL J. ASTRUE,**        )
 **Commissioner of Social Security,**        )        By:    PAMELA MEADE SARGENT
    Defendant.        )        UNITED STATES MAGISTRATE JUDGE

*I. Background and Standard of Review*

Plaintiff, Julie Beverly, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2009). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Beverly protectively filed her application for SSI on December 1, 2005, alleging disability as of September 1, 2005,[1] due primarily to mental impairments. (Record, ("R."), at 115-23.) The claim was denied initially and upon reconsideration. (R. at 98-99, 101-02, 103-04, 107-09.) Beverly then requested a hearing before an administrative law judge, ("ALJ"). (R. at 96.) The ALJ held a hearing on June 26, 2007, at which Beverly was represented by counsel. (R. at 573-619.)

By decision dated July 25, 2007, the ALJ denied Beverly's claim. (R. at 63-75.) The ALJ found that Beverly had not engaged in any substantial gainful activity since September 1, 2005. (R. at 65.) The ALJ found that the medical evidence established that Beverly had severe impairments, namely major depressive disorder and anxiety, but she found that Beverly's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 65-67.) The ALJ also found that Beverly had the residual functional capacity

---

[1]The record shows that Beverly filed a prior claim, which was denied on June 4, 2002. (R. at 143.) The record does not contain documents pertaining to this claim.

to perform simple, noncomplex light[2] work that did not require working with the public or in crowded environments. (R. at 72.) The ALJ found that Beverly was unable to perform any of her past relevant work. (R. at 74.) Based on Beverly's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Beverly could perform, including jobs as a grounds maintenance worker, a building cleaner and an office cleaner. (R. at 74-75.) Thus, the ALJ found that Beverly was not under a disability as defined under the Act and was not eligible for benefits. (R. at 75.) *See* 20 C.F.R. § 416.920(g) (2009).

After the ALJ issued her decision, Beverly pursued her administrative appeals, (R. at 58), but the Appeals Council denied her request for review. (R. at 4-8.) Beverly then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2009). The case is before this court on Beverly's motion for summary judgment filed December 30, 2009, and on the Commissioner's motion for summary judgment filed January 29, 2010.

## II. Facts

Beverly was born in 1975, (R. at 115), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a tenth-grade education and past

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2009).

relevant work experience as a cook, a dietary aid and a security officer. (R. at 146, 194, 583.)

Norman E. Hankins, a vocational expert, also was present and testified at Beverly's hearing. (R. at 613-18.) He classified Beverly's past work as a fast-food cook as medium[3] and skilled. (R. at 613.) Hankins classified her past work as a dietary aid at a nursing home as medium and unskilled and her work as a security guard as light and semiskilled. (R. at 613-14.) Hankins was asked if Beverly could perform her past work if she was limited to simple, noncomplex tasks based on a moderate reduction in concentration. (R. at 614.) He stated that Beverly could perform the jobs as a fast-food cook and a dietary aid. (R. at 614.) Hankins was asked to assume that the individual could not work with the public or in a crowded environment. (R. at 614-15.) He stated that the jobs as a fast-food cook and a dietary aid would be precluded. (R. at 615.)

Hankins was asked to assume a hypothetical individual of Beverly's age, education and work history who could perform simple, noncomplex light work that did not require her to work with the public or in a crowded environment, who could occasionally stoop, crouch, crawl and kneel and never climb. (R. at 615.) Hankins stated that a significant number of jobs existed in the economy that such an individual could perform, including jobs as a janitor, a building cleaner, a housekeeper, a maid and a grounds maintenance worker. (R. at 615-16.) He also stated that there would be no jobs available if the individual had a marked reduction in concentration,

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2009).

persistence or pace.  (R. at 616.) He also stated that there would be no jobs available should the individual be limited as indicated in the mental assessment completed by Jaime Counts, M.A.  (R. at 484-85, 617-18.)

In rendering his decision, the ALJ reviewed records from Dickenson County Public Schools; Dickenson County Behavioral Health Services; Dr. James P. Senter, M.D.; Southwestern Virginia Mental Health Institute; Ralph Ramsden, Ph.D., a licensed clinical psychologist; Hugh Tenison, Ph.D., a state agency psychologist;  B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Kevin Blackwell, D.O.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dickenson County Medical Center; and Dickenson Community Hospital. Beverly's attorney also submitted additional medical records from Dickenson County Behavorial Health Services to the Appeals Council.[4]

Records from Dickenson County Public Schools show that, at age 10, Beverly had a verbal IQ score of 83, a nonverbal IQ score of 77 and a full-scale IQ score of 72.  (R. at 196.)

The record shows that Dr. James P. Senter, M.D., treated Beverly from October 1999 through September 2003 for complaints of left knee pain, gastroesphageal reflux disease, abdominal pain, elevated liver enzymes, cardiac arrhythmia, insomnia and dysthymia. (R. at 207-302.) A September 17, 1999, MRI of Beverly's left knee

---

[4]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 4-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

showed mild chondromalacia[5] patella and evidence of a previous plication procedure. (R. at 206.) An ultrasound of Beverly's abdomen, dated March 22, 2000, was normal, as well as an echocardiogram. (R. at 505.) X-rays of Beverly's thoracic spine, taken on April 26, 2001, showed mild degenerative changes. (R. at 246, 495.) An x-ray of Beverly's left elbow, taken on December 16, 2004, was normal. (R. at 524.)

On November 19, 2001, Beverly was brought to the emergency room at Dickenson County Medical Center for complaints of depression. (R. at 525-30.) It was reported that the police were called after Beverly refused to get out of her vehicle. (R. at 527.) It was reported that Beverly was catatonic and communicated only by writing. (R. at 527.) She was diagnosed with major depression and was transferred to Southwestern Virginia Mental Health Institute. (R. at 526.)

On November 20, 2001, Beverly was admitted to Southwestern Virginia Mental Health Institute for confusion, agitation, guardedness with depressed mood, decreased appetite and decreased sleep with loss of weight. (R. at 304-12, 375-82.) She reported that she had not been taking her medications for at least two weeks because she could not afford them. (R. at 307-08.) Beverly also reported that she felt scared, not going out of her house and fear of her ex-husband, who was reportedly recently released from prison. (R. at 308.) She reported that her ex-husband physically abused her and was sent to prison for stabbing her daughter in the head with a screwdriver. (R. at 304-05.) Beverly reported that she had three daughters, but that she did not have custody of them. (R. at 306.) It was reported that Beverly responded fairly quickly to

---

[5]Chondromalacia is defined as an abnormal softening or degeneration of cartilage of the joints, especially of the knee. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 153 (1995.)

her medications, and she started interacting with her peers and staff appropriately. (R. at 308.) Beverly reported that the medications worked well for her, and she denied any side effects. (R. at 308.) She was discharged on November 26, 2001, with a diagnosis of psychotic disorder, not otherwise specified, and post-traumatic stress disorder. (R. at 308.) Her Global Assessment of Functioning, ("GAF"),[6] score was assessed at 45.[7] (R. at 309.)

The record shows that Beverly received mental health treatment from Dickenson County Behavioral Health Services, ("Dickenson County"), from November 20, 2001, through March 16, 2009. (R. at 13-40, 45-55, 383-85, 413-27, 471-93, 564-71.) Jaime Counts, M.A., and Kelli Viers, R.N., were Beverly's regular treating therapists. (R. at 322, 427, 491-92.) The record shows that in 2002, 2003 and 2004, Beverly reported that her medication helped her symptoms of depression and anxiety. (R. at 344, 354, 357, 361, 370, 385.) On May 4, 2005, Beverly reported that she was "working a lot" to keep her mind off of her children. (R. at 331.) On October 31, 2005, Beverly's case was closed due to noncompliance. (R. at 335, 415.) On December 19, 2005, Beverly returned to Dickenson County to resume treatment. (R. at 335, 415.) She was diagnosed with recurrent, moderate, major depressive disorder and parent-child relational problems. (R. at 322.) In September 2006, December 2006, and February 2007, Beverly reported that her medication helped her symptoms of

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7]A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

depression and anxiety.  (R. at 477, 482, 487.)

On April 3, 2007, Counts completed a mental assessment indicating that Beverly had a limited, but satisfactory, ability to follow work rules, to relate to co-workers, to function independently, to understand, remember and carry out simple instructions and to maintain personal appearance.  (R. at 484-85.) She indicated that Beverly had a seriously limited, but not precluded, ability to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex and detailed instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability.  (R. at 484-85.)

On October 5, 2007, Christy L. Johnson, a counselor with Dickenson County, completed a mental assessment indicating that Beverly had a seriously limited, but not precluded, ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 42-43.) She also indicated that Beverly had no useful ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex and detailed instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability.  (R. at 42-43.) Johnson based these findings on Beverly's poor ability to concentrate and poor memory, as well as her "rages of anger."  (R. at 43.)

On April 10, 2008, Beverly was diagnosed with recurrent, moderate major

depressive disorder and parent-child relational problems. (R. at 13.) Her GAF score was assessed at 53,[8] with her highest GAF score being 60 during the prior year. (R. at 13.) Viers encouraged and stressed the importance of treatment compliance. (R. at 14.) In May 2008, it was reported that Beverly's affect and mood was improved. (R. at 33.) At her sessions throughout 2008, Beverly repeatedly reported that her medication helped her symptoms of depression and anxiety and that she was "doing fine." (R. at 21, 27-28, 34, 36, 39.)

By letter dated January 8, 2009, Dr. Kurtz Alderman, M.D., a physician with Dickenson County, indicated that Beverly had been treated at Dickenson County since December 2005 and that she had been hospitalized twice. (R. at 10-11.) He diagnosed recurrent, moderate major depression without psychosis with associated anxiety and parent-child relationship problems. (R. at 10.) He noted that, in addition, Beverly suffered from physical problems, including back pain, nerve damage and leg and hip pain. (R. at 10.) Dr. Alderman reported that Beverly was unable to work a regular job due to combined psychiatric and physical problems. (R. at 10.) He reported that Beverly's prognosis, with adequate medication, would be that she should be able to remain outside of hospital care. (R. at 11.)

On March 16, 2009, Counts completed a mental assessment indicating that Beverly had a diagnosis of moderate major depressive disorder without psychosis and problems with the legal system. (R. at 51-55.) Counts assessed Beverly's then-current GAF score at 53, with her highest GAF score being 60 in the previous year. (R. at 51.)

---

[8]A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Counts reported that Beverly remained stable with continued medication management, counseling and case management. (R. at 51.) Counts reported that Beverly had an unlimited ability to ask simple questions or request assistance and to adhere to basic standards of neatness and cleanliness. (R. at 53-54.) She also indicated that Beverly had a limited, but satisfactory, ability to understand, remember and carry out very short and simple instructions, to make simple work-related decisions, to respond appropriately to changes in a routine work setting, to be aware of normal hazards and take appropriate precautions, to set realistic goals or make plans independently of others, to maintain socially appropriate behavior and to use public transportation. (R. at 53-54.) Counts reported that Beverly had a seriously limited, but not precluded, ability to remember work-like procedures, to maintain attention for two-hour segments, to sustain an ordinary routine without special supervision, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to deal with normal work stress, to understand, remember and carry out detailed instructions, to deal with stress of semiskilled and skilled work, to interact appropriately with the general public and to travel in unfamiliar places. (R. at 53-54.) She indicated that Beverly could not independently, appropriately or effectively maintain regular attendance and be punctual within customary, usually strict tolerances, to work in coordination with or proximity to others without being unduly distracted, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods on a sustained basis in a regular work setting. (R. at 53.)

On April 19, 2002, Ralph Ramsden, Ph.D., a licensed clinical psychologist, evaluated Beverly at the request of Dickenson County Department of Social Services and the Juvenile and Domestic Relations Court to determine if it was possible for Beverly to regain custody of her daughters. (R. at 313-21.) Beverly reported that she smoked one to one-and-a-half packs of cigarettes daily. (R. at 315.) She reported that her ex-husband both physically and mentally abused her. (R. at 315.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and Beverly obtained a verbal IQ score of 81, a performance IQ score of 69 and a full-scale IQ score of 74. (R. at 317.) Ramsden opined that these test scores were underestimates of Beverly's abilities due to test performance anxiety. (R. at 317.) Ramsden reported that testing could not differentiate the possibility of attention-deficit/hyperactivity disorder or a bipolar condition. (R. at 320.) Ramsden diagnosed anxiety disorder, not otherwise specified, with panic features; adjustment disorder with symptoms of anxiety; rule out bipolar disorder; borderline intellectual functioning; and rule out attention-deficit/hyperactivity disorder. (R. at 320.) He assessed her then-current GAF score at 55. (R. at 320.)

On February 21, 2006, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Beverly at the request of Disability Determination Services. (R. at 406-12.) Beverly reported that her ex-husband physically and mentally abused her. (R. at 408.) She reported frequent nightmares as a result of the abuse. (R. at 408.) Beverly reported that she lost custody of her daughters who apparently "ran away" to a friend's house during a snowstorm. (R. at 408.) She reported that she smoked one to one-and-a-half packs of cigarettes a day. (R. at 410.) Lanthorn reported that Beverly appeared to be "somewhat exaggerating her symptoms and circumstances." (R. at

409.) For example, when she was asked the question: "How many weeks are there in a year?" she answered, "Three." (R. at 409.) Lanthorn reported that Beverly's affect and mood signaled the presence of some anxiety and tension, as well as ongoing depression. (R. at 410.) Lanthorn diagnosed dysthymic disorder; rule out major depressive disorder, not otherwise specified; rule out agoraphobia without history of panic disorder; borderline intellectual functioning, by his estimate; and rule out personality disorder, not otherwise specified. (R. at 410.) Lanthorn assessed Beverly's then-current GAF score at 61-65.[9] (R. at 411.) Lanthorn reported that Beverly was capable of performing a 40-hour workweek at a simple and straightforward job. (R. at 411.)

On March 20, 2006, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a mental assessment indicating that Beverly was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or

_____

[9]A GAF score of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 388-90.) Tenison reported that Beverly was able to meet the basic mental demands of competitive work on a sustained basis. (R. at 390.)

That same day, Tenison completed a Psychiatric Review Technique form, ("PRTF"), indicating that Beverly suffered from an affective disorder, mental retardation and an anxiety-related disorder. (R. at 391-405.) He indicated that Beverly had mild limitations in her ability to perform activities of daily living. (R. at 401.) Tenison indicated that Beverly had moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 401.) He indicated that there was no evidence that Beverly had experienced any episodes of decompensation. (R. at 401.) He reported that Beverly could perform simple, unskilled work. (R. at 405.)

On July 21, 2006, Dr. Kevin Blackwell, D.O., examined Beverly at the request of Disability Determination Services. (R. at 428-32.) Dr. Blackwell reported that Beverly was alert, cooperative and oriented with good mental status. (R. at 429.) Beverly had tenderness throughout the mid thoracic and lumbar perispinal muscles. (R. at 430.) Beverly stated that she could not squat or step up on her toes during the examination. (R. at 430, 432.) Dr. Blackwell noted that her gait was normal. (R. at 430.) Her upper and lower reflexes were good and equal bilaterally. (R. at 430.) X-rays of Beverly's lumbar spine showed mild scoliosis with a curvature. (R. at 433,

460.) X-rays of Beverly's knees were normal. (R. at 434-35, 461-62.) Dr. Blackwell diagnosed chronic low back pain, bilateral knee pain and history of anxiety. (R. at 430.) He found that Blackwell could occasionally lift items weighing up to 45 pounds and frequently lift items weighing up to 20 pounds. (R. at 430.) He further found that bending and stooping at the waist were limited to two-thirds of the day or less. (R. at 430.) Squatting and kneeling activities were limited to one-third of the day or less. (R. at 430.) He indicated that Beverly could stand for up to six hours in an eight-hour workday and that she could sit for up to eight-hours in an eight-hour workday. (R. at 430.)

On September 1, 2006, Julie Jennings, Ph.D., a state agency psychologist, completed a mental assessment indicating that Beverly was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to set realistic goals or make plans independently of others. (R. at 436-38.) Jennings opined that Beverly was able to meet the basic mental demands of competitive work on a sustained basis. (R. at 438.)

That same day, Jennings completed a PRTF indicating that Beverly suffered from an affective disorder, mental retardation and an anxiety-related disorder. (R. at 439-53.) She indicated that Beverly had moderate limitations in her ability to perform

-14-

activities of daily living, to maintain social functioning and to maintain concentration, persistence or pace. (R. at 449.) She indicated that Beverly had experienced one or two episodes of decompensation. (R. at 449.)

On September 6, 2006, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment indicating that Beverly had the residual functional capacity to perform medium work. (R. at 454-59.) Dr. McGuffin indicated that Beverly could occasionally balance, stoop, kneel, crouch and crawl and never climb. (R. at 456.) No manipulative, visual or communicative limitations were noted. (R. at 456-57.) He indicated that Beverly could not work around hazards, such as machinery and heights. (R. at 457.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 25, 2007, the ALJ denied Beverly's claim. (R. at 63-75.) The ALJ found that the medical evidence established that Beverly had severe impairments, namely major depressive disorder and anxiety, but she found that Beverly's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 65-67.) The ALJ also found that Beverly had the residual functional capacity to perform simple, noncomplex light work that did not require working with the public or in a crowded environment. (R. at 72.) The ALJ found that Beverly was unable to perform any of her past relevant work. (R. at 74.) Based on Beverly's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Beverly could perform, including jobs as a grounds maintenance worker, a building cleaner and an office cleaner. (R. at 74-75.) Thus, the ALJ found that Beverly was not under a disability as defined under the Act and was not eligible for benefits. (R. at 75.) *See* 20 C.F.R. § 416.920(g).

Beverly argues that the ALJ erred by failing to properly address the medical opinions of record. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-13.) In particular, Beverly argues that the ALJ erred by failing to include and analyze the opinions of the state agency psychologists and physicians. (Plaintiff's Brief at 11-13.) Beverly also argues that the ALJ erred in failing to give proper weight to her treating therapist Counts. (Plaintiff's Brief at 13-20.) Finally, Beverly argues that her case should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of new and material evidence. (Plaintiff's Brief at 19-20.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may,

under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

Beverly argues that the ALJ erred by failing to include and analyze the opinions of the state agency psychologists and physicians. (Plaintiff's Brief at 11-13.) Beverly also argues that the ALJ erred in failing to give proper weight to her treating therapist Counts. (Plaintiff's Brief at 13-20.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's weighing of the evidence of record. The ALJ found that Beverly could perform simple, noncomplex tasks that did not require her to work around the public or in a crowded environment. (R. at 72.) Beverly argues that the state agency psychologists' assessments are inconsistent with this finding. (Plaintiff's Brief at 11-13.) This is not the case. The ALJ explicitly mentioned the assessments of Tenison and Jennings and their findings and considered them in her decision. (R. at 69.) Furthermore, both psychologists' conclusions support the ALJ's residual functional capacity finding. Tenison opined that Beverly was capable of performing simple, unskilled work. (R. at 405.) Jennings opined that Beverly could perform the basic mental demands of competitive work on a sustained basis. (R. at 438.) In addition, Lanthorn opined in February 2006 that Beverly was "quite capable of focusing concentration" and "capable of performing a 40-hour workweek at a simple and straightforward job." (R. at 409, 411.) Furthermore, the record shows that when Beverly was compliant with treatment, her symptoms of anxiety and depression were relieved with medication. (R. at 21, 27-28, 34, 36, 39, 344, 354, 357, 361, 370, 385, 477, 482, 487.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Progress notes from Dickenson County indicate that Beverly received conservative treatment of periodic therapy appointments and medication. (R. at 322, 413, 418, 472, 571.) Nothing in the treatment notes suggest that Beverly had any limitations beyond those outlined above and imposed by the ALJ in her residual functional capacity finding. The ALJ noted that she was rejecting Counts's assessment because it was not consistent with her own ongoing counseling notes, the assigned GAF scores and Beverly's conservative treatment and management. (R. at 74.) She found that Counts appeared to have based her conclusions on Beverly's self-reported and self-imposed limitations, as there was no evidence that objective testing was performed by Counts or by Beverly's treating psychiatrist. (R. at 74.)

With regard to Beverly's physical residual functional capacity, the ALJ found that she could perform light work. (R. at 72.) The ALJ noted that in September 1999, Beverly had treatment of chondromalacia of the patella; however, x-rays of her knee in July and August 2006 were normal. (R. at 66, 206,434-45, 461-62.) The ALJ noted that there was no objective evidence of ongoing treatment for back, hip or knee pain and that Beverly took only over-the-counter medication for pain. (R. at 66, 73.) The ALJ described and considered Dr. McGuffin's assessment in her decision, but did not include his limitation regarding exposure to hazards in her residual functional capacity finding. (R. at 66, 72.) Dr. McGuffin was the only physician to limit Beverly's exposure to hazards. (R. at 457.) Dr. Blackwell noted that Beverly had "symmetrical balance," and there was no evidence in the record that Beverly had trouble balancing. (R. at 430.) Dr. Blackwell noted that Beverly had a normal gait, and her upper and lower reflexes were good and equal bilaterally. (R. at 430.) Based on this, I find that the ALJ properly weighed the medical evidence of record.

Finally, Beverly argues that her case should be remanded for further development by the Commissioner of Social Security pursuant to sentence six of 42 U.S.C. § 405(g). Section 405(g) states that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material, and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C.A. § 405(g) (West 2003 & Supp. 2009.)

For additional evidence to merit remand pursuant to sentence six, it must be new and material, and Beverly must present good cause for her failure to incorporate the evidence in the record of the prior proceeding. *See* 42 U.S.C. § 405(g); *see also Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); *Arthur v. Barnhart*, 211 F. Supp. 2d 783, 787-88 (W.D. Va. 2002). Evidence is new if it is not duplicative or cumulative, and it is material if it creates a reasonable possibility that it would have changed the outcome. *See Wilkins,* 953 F.2d at 96. Based on my review of the record in this case, Beverly's motion to remand pursuant to sentence six is inappropriate. Beverly does not seek remand for consideration of "new" evidence as required by sentence six of § 405(g). The evidence Beverly cites is evidence that was presented to, and considered by, the Appeals Council. That being the case, as stated above, the court must determine whether substantial evidence supports the Commissioner's decision considering the record in its entirety, including the evidence presented to the Appeals Council. *See Wilkins*, 953 F.2d at 96. For all of the above-stated reasons, I find that substantial evidence exists to support the ALJ's finding that Beverly was not disabled.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the ALJ's weighing of the evidence with regard to Beverly's mental residual functional capacity;

2.  Substantial evidence exists to support the ALJ's weighing of the evidence with regard to Beverly's physical residual functional capacity; and

3.  Substantial evidence exists to support the ALJ's finding that Beverly is not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Beverly's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file

written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 28th day of May 2010.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE